**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 09-1126**

———————

FRANK SHIN, M.D.,

             Plaintiff - Appellant,

        v.

UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION; SUSAN
WOLFSTHAL, Doctor,

             Defendants - Appellees.

———————

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   William  D.  Quarles,  Jr.,  District
Judge.  (1:08-cv-00240-WDQ)

———————

Argued:  January 28, 2010          Decided:  March 11, 2010

———————

Before MICHAEL and DUNCAN, Circuit Judges, and R. Bryan HARWELL,
United States District Judge for the District of South Carolina,
sitting by designation.

———————

Affirmed  by  unpublished  opinion.   Judge  Duncan  wrote  the
opinion, in which Judge Michael and Judge Harwell joined.

———————

**ARGUED:** Jason I. Weisbrot, SNIDER & ASSOCIATES, LLC, Baltimore,
Maryland, for Appellant.   Neal Mullan Brown, WARANCH & BROWN,
LLC, Lutherville, Maryland, for Appellees.  **ON BRIEF:** Michael J.
Snider,  SNIDER  &  ASSOCIATES,  LLC,  Baltimore,  Maryland,  for
Appellant.    Nicole  A.  McCarus,  WARANCH  &  BROWN,  LLC,
Lutherville, Maryland, for Appellees.

———————

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

Frank Shin, M.D., appeals a decision of the district court granting summary judgment to the University of Maryland Medical System Corporation ("UMMSC") and its Residency Program director Dr. Susan D. Wolfsthal (collectively, "Appellees"). The district court granted summary judgment to Appellees on Dr. Shin's discriminatory discharge and failure to provide reasonable accommodation claims, reasoning that Dr. Shin was not "a qualified individual with a disability" under the Americans with Disabilities Act (the "ADA"). 42 U.S.C. § 12111(8) (2006). Because we agree that Dr. Shin could not perform the essential functions of his job with or without reasonable accommodation, we affirm.

I.[1]

Dr. Shin began his medical internship with UMMSC on June 24, 2006.[2] Initially, he performed his medical intern duties satisfactorily. Medical interns are rated on a 9-point scale at

---

[1] Because summary judgment was granted below, we present the facts affecting our ADA analysis in the light most favorable to the appellant. See Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir. 2009).

[2] Dr. Shin had just completed medical school at Boston University, receiving eleven Honors grades, seven High Pass grades, and twenty Pass grades.

3

UMMSC. Generally, the score of 1-3 is deemed a failure; 4-6 is satisfactory; and 7-9 is superior. In his first rotation through Emergency Care Services from June 24, 2006, through July 27, 2006 ("Block 1"), Dr. Shin scored eight out of nine for overall competence. His evaluator stated that "Dr. Shin [was] ready to be an excellent clinician, [having] had a strong start to his first year of residency." J.A. 297.

After the first month, however, Dr. Shin's evaluation scores began to drop. For his rotation through Critical Care Services from July 21, 2006, through August 23, 2006 ("Block 2"), both Dr. Stephen Gottlieb and Dr. Mandeep Mehra gave Dr. Shin an overall competence score of three. Dr. Mehra explained that Dr. Shin had to be "shadowed heavily by the residents to prevent medical errors," which placed "a greater burden of responsibility on the other interns and resulted in residents needing to act as interns." S.J.A. 85.[3] During this rotation, Dr. Mehra limited Dr. Shin's workload to three patients and once had to have other residents help complete his work.

Dr. Shin's deteriorating performance prompted Dr. Wolfsthal to meet with him about the problem. At that meeting, Dr. Shin explained that he found "it difficult to balance new admissions in the setting of taking care of patients already on the

_____

[3] References in the record to "S.J.A." are to the Supplemental Joint Appendix.

4

service." S.J.A. 86. He also explained that, to keep up with his workload, he often arrived at 6 a.m. and stayed until 8-9 p.m. Dr. Shin added that on night call he would take one to two extra Provigil pills to stay awake.[4] To address the problem, Dr. Wolfsthal and Dr. Shin developed the following action plan:

> 1. [Dr. Shin] would thoroughly work up 2 patients while on call.
>
> 2. He would meet with [Dr.] Rebecca Manno on a weekly basis to discuss efficiency and organizational skills as well as key topics in cardiology.
>
> 3. He [would] check with [Dr.] Alan Krumholz [in the Department of Neurology] . . . to see how he might best manage his medications in this setting.
>
> 4. In addition to working on organizational skills, he [would] also improve his skills in retrieving old records, dealing with cross-cover issues[5] and writing notes.
>
> 5. Whenever called on a cross-over issue, he [would] review the event and his plans with [a resident].

S.J.A. 87 (footnote call number added).

---

[4] Provigil, or "Modafanil," is "[o]fficially [used] for narcolepsy and excessive sleepiness associated with things like shift work, sleep apnea, and multiple sclerosis, but also used as an augmenting agent to boost the effectiveness of standard antidepressants or when antidepressants cause excessive daytime sleepiness as a side effect." Jack M. Gorman, The Essential Guide to Psychiatric Drugs 131 (4th ed. 2007).

[5] Interns at UMMSC are responsible for their co-interns' patients when their co-interns go home. On-call interns are given an information sheet detailing information about each patient, such as the patient's allergies, location, reason for admission, chronic medical problems, and medications, and other information that may be pertinent to the case.

Two weeks later, Dr. Wolfsthal and Dr. Shin met again to discuss his progress. Despite the action plan, Dr. Wolfsthal discovered that Dr. Shin had written orders for patients that were inappropriate, such as "ordering IV Prednisone, ordering [Fresh Frozen Plasma] on the wrong patient and placing a patient on a standing order of narcotics that cause somnolence." S.J.A. 88. Thus, Dr. Wolfsthal asked Dr. Shin to continue meeting with both Dr. Manno and Dr. Krumholz. In addition, she gave him the phone number for the Employee Assistance Program so that he could seek confidential counseling.

On September 1, 2006, UMMSC placed Dr. Shin on probation. The Clinical Competency Committee noted that Dr. Shin had "extremely poor organizational skills and major knowledge deficits." S.J.A. 91. Although the Committee recognized that Dr. Shin had performed better during his Block 3 rotation,[6] that success was attributed to the fact that Dr. Shin was generally limited to three or four patients and that those patients were "the less complicated ones." S.J.A. 91. Thus, UMMSC informed

_____

[6] For his rotation through Medicine 1 - General Internal Medicine from August 17, 2006, through September 19, 2006 ("Block 3"), Dr. Shin scored an eight for overall competence. In a section labeled "Resident Strengths," his evaluator Dr. Jamal Mikdashi described Dr. Shin as a "thorough and hard worker, motivated," that "at times get[s] overwhemled [sic]." J.A. 299.

6

Dr. Shin that he would need to meet the following criteria before December 1, 2006, to remain in the internship program:

> 1. Achieve scores of 5 in all areas of competency in all rotations.[7]
>
> 2. Demonstrate the ability to manage a census of 4-7 patients and admit 5 patients per call night. He may on occasion admit less than 5 patients depending on the flow of admissions, but he must demonstrate the ability to admit 5 when the need arises.
>
> 3. Demonstrate improvement in both his written and oral presentations.
>
> 4. Continue meeting weekly with Dr. Rebecca Manno to work on organizational skills and efficiency as well as enhancing his knowledge base.
>
> 5. Meet every 2-3 weeks with Dr. Wolfsthal.
>
> 6. Be evaluated and have a drug screen at the Employee Assessment Program (EAP). . . .
>
> 7. At the end of 3 months, Frank will do a full H&P ([Clinical Evaluation Exercise]) under direct observation by Dr. Graeme Forrest.

S.J.A. 92 (footnote call number added).

Dr. Shin's overall competence scores, however, never improved. For his rotation through Critical Care Unit/Telemetry

---

[7] Although a five is generally classified as "satisfactory" in other medical internship programs, a five "is borderline in [UMMSC's] program. That already means there are issues that are being raised." S.J.A. 394-95. "Interns and residents with scores of five and below are generally brought to the [Clinical Competency Committee] for further discussion." S.J.A. 395. "The mean score for an Intern by the end of the year is approximately 7.3, plus or minus a very small standard deviation, so all the scores are between maybe 7.1 and 7.5." S.J.A. 394.

("Block 4"), Dr. Gary Plotnick gave Dr. Shin a four, and Dr. John Kastor gave him a three. Dr. Kastor characterized Dr. Shin's rotation as a "troubled performance," and recommended that Dr. Shin not be allowed to "[a]dmit more than one patient on call until [h]is ability to d[e]al with more information improves." S.J.A. 94. Dr. Kastor also noted confidentially that Dr. Shin displayed "[t]he poorest performance by an intern that [he had] experienced at [UMMSC]." S.J.A. 248. Similarly, Dr. Plotnick explained that Dr. Shin had "difficulty putting it all together" and "[n]eed[ed] help synthesizing and seeing the big picture." S.J.A. 93. Dr. Plotnick communicated to Dr. Wolfsthal that Dr. Shin "need[ed] complete supervision." S.J.A. 95. These reviews prompted Dr. David Tasker to recommend that Dr. Shin no longer be allowed to attend the outpatient clinic, a requirement of the internship program. He reasoned that this would "take some of the pressure off [Dr. Shin]." S.J.A. 101.

Dr. Shin also received poor reviews for his rotation through Med 4 – General Internal Medicine ("Block 6"). Both Dr. Majid Cina and Dr. Aba Ibe gave him a competence score of four. S.J.A. 105-06. Dr. Cina commented that Dr. Shin's "most glaring deficiencies . . . [were] lack of efficiency, an inability to think globally about patients, poor organization skills, and difficulty with prioritization. . . . He required extensive help with workload." S.J.A. at 105. Likewise, Dr. Ibe

8

explained that she "found [her]self relying heavily on the resident to constantly supervise him and [she] also stayed late on many occasions to ensure that his documentation on patients was appropriate." S.J.A. at 106.

Finally, for his Block 7 rotation through the Veterans Affairs Medical Center, Dr. Richard Rees gave Dr. Shin a one for overall competence. To explain such a low evaluation, Dr. Rees noted:

> Frank's overall performance was unsatisfactory. He doesn't know what he doesn't know. He is extremely argumentative and refused to accept explanations for why certain decisions were made when they were based on clear evidence and were well accepted standards of care[.] Taking that one step further, he would then write orders on those patients based on what he felt was right/appropriate, in direct contradiciton [sic] to the orders which the resident stated he should write . . . . To make things even worse, when I discussed these issues with him, it was clear he had no insight into his problems.

S.J.A. 115. Confidentially, Dr. Rees said that Dr. Shin was "dangerous and should no longer be allowed to continue in a direct patient care role." S.J.A. 249. He felt that Dr. Shin was not remediable and that an extended internship would be of no benefit.

Not only were Dr. Shin's performance scores low, but he also failed the Clinical Evaluation Exercise.[8] Although Dr. Shin

---

[8] "The clinical evaluation exercise (CEX), a direct observation of a history and physical examination with feedback (Continued)

was able to get an adequate history of the patient, he was unable to perform a satisfactory physical examination. In his assessment, Dr. Forrest noted twenty-three problems with Dr. Shin's physical examination, including the fact that Dr. Shin "[p]erformed [the] exam without turning on the lights" and "[f]ailed to wash [his] hands before touching the patient." S.J.A. 102. In his summary, Dr. Forrest explained that "[Dr. Shin's] clinical competency is borderline. He may get an adequate history and utilize the resources around him, but his thinking is rather rigid and inflexible and he is not very open to suggestions of help." S.J.A. 103. Dr. Forrest was particularly concerned that Dr. Shin's "examination technique [was] so poor that he may miss something obvious." Id.

The record reflects that Dr. Forrest's concerns proved true: Dr. Shin misdiagnosed patients or prescribed to them the wrong medications while at UMMSC. For example, during his Block 7 rotation, a nurse called to inform Dr. Shin that the blood pressure of one of his cross-over patients had dropped. In response, Dr. Shin told the nurse to give that patient fluids. Dr. Lee-Ann Wagner overheard the conversation and instructed Dr.

---

to the house officer, is a form of clinical skills evaluation used by many internal medicine training programs." Frank J. Kroboth et al., Didactive Value of the Clinical Evaluation Exercise: Missed Opportunities, 11(9) J. Gen. Internal Med. 551, 551 (1996).

Shin to go and see the patient. Specifically, she reminded Dr. Shin that "[w]hen a nurse calls that there's been a change in a vital sign like this, you need to see the patient." S.J.A. 206-07. Upon arriving at the patient's room, Dr. Wagner and Dr. Shin learned that the patient was in critical condition and needed to be rushed to the Intensive Care Unit. Dr. Wagner asked Dr. Shin to page the Intensive Care Resident while she prepared the patient to be moved. Dr. Shin, however, could not follow Dr. Wagner's instructions on how to obtain the resident's beeper number. Dr. Wagner was thus forced to leave the critically ill patient so that she could page the resident.

Similarly, during his Block 4 rotation, Dr. Shin prescribed a large amount of Lasix[9] for a patient with aortic stenosis.[10] After being subjected to ten times the medication he was supposed to receive, the patient began "urinating out[] more fluid than [UMMSC] would have wanted for a patient with aortic stenosis." S.J.A. 281-82. Although the patient suffered no lasting "bad effects," after that incident, Dr. James Strait

---

[9] Lasix, or "Furosemide," is a "diuretic (water pill) used to treat high blood pressure. It is also used to treat swelling due to fluid retention associated with heart failure or kidney or liver disease." The Pocket Guide to Prescription Drugs 709 (9th ed. 2010).

[10] Aortic stenosis is a heart valve disorder, in which "the heart -- specifically, the left ventricle -- has to work harder to pump blood to the brain and other vital organs." The Merck Manual of Health & Aging 722 (Keryn A.G. Lane ed., 2004).

11

felt he needed to review "all of [Dr. Shin's] orders very closely." S.J.A 282. Yet, even under such close supervision, Dr. Shin continued making mistakes.[11]

UMMSC made assistance available to help Dr. Shin complete his medical internship. For example, UMMSC provided Dr. Shin with "tutoring from [its] chief residents," S.J.A. 66; "mentoring from several of [their] faculty members and residents," S.J.A. 66; less complex patients and fewer admissions; and dayfloaters and "moonlighters to help with [his] workload" at certain critical times, S.J.A. 86, 193-94. UMMSC also excused Dr. Shin from participating in the outpatient clinic -- a requirement of the internship program. Finally, several faculty members and residents assisted Dr. Shin with his duties. While the "Friends of Frank" would meet weekly with Dr. Shin to discuss his various problems,[12] several of Dr. Shin's

---

[11] Other mistakes included (1) wrongly documenting that "[t]he patient [was] deceased," when in fact the patient was not; (2) giving wrong orders for insulin (NPH 40/30 BID) at discharge in addition to starting a new dose of Lantus; and (3) omitting critical information, such as vital signs, in patients' medical histories. S.J.A. 247.

[12] Dr. Strait testified as follows, "We were having meetings with Frank and Dr. Wali on a weekly basis, I and one of the other residents, to try to discuss various time management issues and try to help him out. We would meet, have lunch, and then discuss things." S.J.A. 255. They met to discuss what sort of issues Dr. Shin was having and to "see if [they] c[ould] help him out." S.J.A. 257. They sometimes called it the "Friends of Frank." S.J.A. 257.

supervisors would "write his notes" or verbally dictate them to him, S.J.A. 182, "wr[i]te orders on his patients," S.J.A. 222, or encourage him to go home and leave the "leftover work [for] . . . the resident," S.J.A. 438.

Despite these accommodations, Dr. Shin continued having difficulties. As a consequence, both on his own initiative and at the direction of UMMSC, Dr. Shin sought evaluation by several mental health professionals to better understand his problems. Dr. James F. McTamney diagnosed Dr. Shin with possible Attention Deficit Disorder, finding that Dr. Shin had difficulties "switch[ing] back and forth between ideas." S.J.A. 113. He also noted that Dr. Shin's "working memory was . . . below expected levels." Id. He suggested Dr. Shin be placed on medication and seek the aid of a rehabilitation specialist. Similarly, after a thorough evaluation, Dr. Jill A. RachBeisel diagnosed Dr. Shin with "significant impairment in visual-spatial reasoning and visual memory," S.J.A. 124, and recommended that Dr. Shin be placed on a trial of stimulant medication, consider Strattera,[13] and seek behavioral coaching. On January 5, 2007, UMMSC placed Dr. Shin on leave so that he

---

[13] Strattera, also known as "Atomoxetine hydrochloride," is "used to treat attention-deficit/hyperactivity disorder (ADHD)." The Pocket Guide, supra note 9, at 1226. This medication is believed to help "increase attention and decrease impulsiveness and hyperactivity." Id.

could be further evaluated and engage in more extensive rehabilitation for his deficiencies.

Even with medication, however, Dr. Shin did not improve. Thus, on March 12, 2007, Dr. Craig D. Thorne determined that Dr. Shin had reached maximal medical improvement but was unfit to return to work as a medical intern. UMMSC terminated Dr. Shin by letter dated April 4, 2007. His termination was upheld in an internal grievance proceeding held on June 18, 2007.

Before being terminated, Dr. Shin requested the following accommodations: (1) fewer patients; (2) additional time to record and synthesize verbal information from the night flow team; and (3) "a more compassionate environment." J.A. 202. UMMSC rejected implementation of these accommodations. It noted that Dr. Shin would not achieve the minimum 210 admissions required by the Accreditation Council for Graduate Medical Education ("ACGME") in his first year if his admissions were further reduced, and that more time to absorb information from the night team would not adequately train him in the skills he needed to become a physician. As to his request for a more compassionate environment, UMMSC explained that many of Dr. Shin's colleagues and administrators had already come to his aid. Under these circumstances, UMMSC felt termination was warranted.

14

Dr. Shin filed a complaint with the United States Equal Employment Opportunity Commission, which issued its right to sue letter on November 1, 2007. He then brought suit against UMMSC, the Medical Center, the Residency Program, and Dr. Wolfsthal, alleging both discriminatory discharge and the failure to provide reasonable accommodation in violation of the ADA and the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., as well as state law claims for wrongful discharge, breach of contract, and defamation. Dr. Shin voluntarily dismissed the Medical Center and the Residency Program as defendants on February 27, 2008. On January 7, 2009, the district court granted summary judgment to UMMSC and Dr. Wolfsthal on the ADA claims, and declined supplemental jurisdiction over Dr. Shin's state law claims. This appeal followed.

II.

On appeal, Dr. Shin maintains that the district court erroneously granted summary judgment to Appellees on his claims under the ADA. We review a district court's decision to grant summary judgment de novo, "viewing the facts and the inferences to be drawn therefrom in the light most favorable to the nonmovant." Riddick ex rel. Riddick v. Sch. Bd. of the City of Portsmouth, 238 F.3d 518, 522 (4th Cir. 2000). Summary judgment

15

is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

Dr. Shin's suit is based on the ADA,[14] the pertinent part of which provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees, . . . job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2006). "Discrimination" as used in the ADA prohibits not only disparate treatment because of an employee's disability, see id., but also the

---

[14] Significant changes to the ADA took effect on January 1, 2009, after this appeal was filed. See ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Congress did not express its intent for these changes to apply retroactively, and so we look to the law in place prior to the amendments. Landgraf v. USI Film Prods., 511 U.S. 244, 270-71 (1994); Olatunji v. Ashcroft, 387 F.3d 383, 389 (4th Cir. 2004) ("In the face of congressional silence on the temporal reach of a given statute, it is presumed that Congress did not intend for the statute to be applied retroactively."). Our sister circuits have found that the 2008 ADA amendments are not retroactive, see Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 34 n.3 (1st Cir. 2009); EEOC v. Agro Distrib., LLC, 555 F.3d 462, 469-70 n.8 (5th Cir. 2009); Milholland v. Sumner County Bd. of Educ., 569 F.3d 562, 565-67 (6th Cir. 2009); Fredricksen v. United Parcel Serv., Co., 581 F.3d 516, 521 n.1 (7th Cir. 2009); Becerril v. Pima County Assessor's Office, 587 F.3d 1162, 1164 (9th Cir. 2009); Lytes v. DC Water & Sewer Auth., 572 F.3d 936, 939-42 (D.C. Cir. 2009), and we see no reason to disagree with their conclusion.

16

failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," id. § 12112(b)(5)(A), and "denying employment opportunities to a job applicant or employee," where the denial of the employment opportunity "is based on the need . . . to make reasonable accommodation," id. § 12112(b)(5)(B). See Smith v. Ameritech, 129 F.3d 857, 866 (6th Cir. 1997); Sieberns v. Wal-Mart Stores, Inc., 125 F.3d 1019, 1021-22 (7th Cir. 1997); see also Burch v. Coca-Cola Co., 119 F.3d 305, 314 (5th Cir. 1997) (recognizing that a reasonable accommodation claim under the ADA differs from a wrongful termination claim under the ADA), cert. denied, 522 U.S. 1084 (1998). In his complaint, Dr. Shin alleged both discriminatory discharge and the failure to provide reasonable accommodation.

For both wrongful termination and the failure to provide reasonable accommodation, a plaintiff must first establish that he is a "qualified individual with a disability" under the ADA. See Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 (4th Cir. 2004) (applying this standard to wrongful termination claim); Rhoads v. FDIC, 257 F.3d 373, 387 (4th Cir. 2001) (applying this standard to failure to accommodate claim); see also Sieberns, 125 F.3d at 1022 ("No matter the type of discrimination alleged . . . a plaintiff must establish first

17

that he was "'a qualified individual with a disability.'") (internal quotations omitted). The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Thus, in order to survive summary judgment on his ADA claims, Dr. Shin had to produce evidence showing that he is both qualified and disabled. In its order, after determining that Dr. Shin had sufficiently created a genuine issue of material fact as to whether Appellees regarded him as disabled,[15] the district court

---

[15] The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2)(A)-(C). The district court concluded that Dr. Shin had not met his burden as to (A) or (B), but that a genuine dispute remained as to (C). We recognize that prior to the 2008 ADA amendments, courts were split on whether a plaintiff could bring an accommodation claim if he could prove only that he was regarded as having a disability. Compare Kaplan v. City of N. Las Vegas, 323 F.3d 1226, 1232-33 (9th Cir. 2003) (concluding that there is no duty to accommodate an individual who is regarded as having a disability); Weber v. Strippit, Inc., 186 F.3d 907, 916-17 (8th Cir. 1999) (same); Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999) (reaching same conclusion without analysis); and Newberry v. E. Tex. State Univ., 161 F.3d 276, 280 (5th Cir. 1998) (same); with (Continued)

18

found that Dr. Shin was unable to perform the essential functions of his job with or without reasonable accommodation, and thus granted summary judgment in favor of Appellees. Dr. Shin challenges this latter finding. He contends that he could indeed perform his job's essential functions. Alternatively, Dr. Shin argues that he could have performed these essential functions if UMMSC had made reasonable accommodations. We address each argument in turn.

A.

We first consider whether Dr. Shin was able to perform the essential functions of his job. The essential functions of a job are those "that bear more than a marginal relationship to the job at issue." Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213 (4th Cir. 1994) (internal citations omitted).

---

D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1240 (11th Cir. 2005) (concluding that there is a duty to accommodate an individual who the employer regards as having a disability); Kelly v. Metallics W., Inc., 410 F.3d 670, 675-76 (10th Cir. 2005) (same); Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 772-76 (3d Cir. 2004) (same); and Katz v. City Metal Co., Inc., 87 F.3d 26, 32-33 (1st Cir. 1996) (same). This court has not taken a position on this issue. See Wilson v. Phoenix Specialty Mfg. Co., Inc., 513 F.3d 378, 388 (4th Cir. 2008). Nevertheless, because we resolve this appeal on other grounds, we need not address whether Dr. Shin was an individual with a disability within the meaning of the ADA, nor whether Dr. Shin could bring an accommodation claim if he could prove only that he was being regarded as disabled.

19

The parties do not dispute the district court's determination that

> [t]he essential functions of Dr. Shin's position were to provide competent medical care to patients with efficiency and reasonable autonomy. [UMMSC's] Graduate Medical Education Policy and Procedure Manual states that a resident should be able to "quickly and accurately integrate all information received" and identify findings, provide a reasoned explanation, and prescribe appropriate medications "in an efficient and timely manner." One of Dr. Shin's responsibilities . . . was to "provide safe and appropriate care for patients."

J.A. 192-93 (internal citations omitted). Instead, Dr. Shin argues that his performance evaluations demonstrate that he performed those essential functions.[16] We disagree.

The evaluations upon which Dr. Shin relies do not support his argument. Aside from favorable reviews during his Block 1 and Block 3 rotations, his reviews are all unsatisfactory. Dr. Shin even conceded that, other than in June, his evaluations do not show that he "establish[ed] [him]self as a satisfactory resident." S.J.A. 357. The record also shows that Dr. Shin was

_____

[16] Dr. Shin also argues that he was qualified for the position as evidenced by his academic accolades. In particular he notes that his "transcript while at Boston University School of Medicine shows that [he] received 9 Honors, 10 High Passes, and 20 Passes." Appellant's Br. at 30. While that may be so, as the district court noted, "'[s]tudent performance and performing the essential functions of a resident physician are [very] dissimilar.'" J.A. 193 (quoting Stopka v. Med. Univ. of S.C., Case No. 2:05-1728-CWH, 2007 WL 2022188, at *13 (D.S.C. July 11, 2007)). One may achieve high marks throughout one's education and still not be able to perform the essential functions of a job.

20

unable "to provide competent medical care to patients with . . . reasonable autonomy." J.A. 192. In their evaluations of Dr. Shin, many of his supervisors stated that Dr. Shin required constant supervision and aid. Dr. Mehra explained that during Block 2, Dr. Shin "was shadowed heavily by the residents to prevent medical errors." S.J.A. 85. Similarly, Dr. Cina noted that while in Block 6, Dr. Shin "required extensive help with workload. Because of this, the senior resident functioned in a hybrid resident/intern role, and [he] functioned in a hybrid attending/resident role." S.J.A. 105.

His supervisors also explained that Dr. Shin was highly inefficient. Several evaluators noted that Dr. Shin "need[ed] more organization," S.J.A. 84, "lack[ed] . . . efficiency," S.J.A. 105, and "appeared to be frequently behind schedule for most of his tasks," S.J.A. 106. Dr. Wagner testified that Dr. Shin "was so inefficient that he couldn't get those things [listed in his task list] done for his patients," and thus, she relied on "the medical students on the team . . . [to do] a lot of the tasks for [Dr. Shin.]" S.J.A. 202-03. Similarly, Dr. Strait testified that Dr. Shin "would spend too much time on unrelated things and not enough time on the . . . important things." S.J.A. 274. Such behavior forced one of his supervisors to stay "late on many occasions to ensure that his documentation on patients was appropriate." S.J.A. 106.

21

Finally, the evidence shows that Dr. Shin was not able to "to provide safe and appropriate care for patients." J.A. 193 (internal quotations omitted). Not only did Dr. Shin order the wrong medications for several patients, but his poor judgment in critical situations forced his supervisors to step in and prevent several errors. Dr. Shin's failure to check up on a patient after that patient's vitals changed is of particular concern. Dr. Wagner's constant supervision of Dr. Shin's actions allowed her to help a patient at a critical time. Left to his own devices, Dr. Shin would have left that patient unattended.

This evidence, even when taken in the light most favorable to Dr. Shin, demonstrates that Dr. Shin was not performing the essential elements of his job.[17] No reasonable jury could find

_____

[17] Nevertheless, Dr. Shin maintains that if he did fail to perform the essential functions of his job, it was only because Appellees forced him to work beyond the work hour limits set forth by ACGME. We disagree. There is no evidence on the record showing that Appellees forced Dr. Shin to work such long hours. Rather, Appellees required Dr. Shin to complete all his work, and for Dr. Shin, that took longer than the maximum eighty hours per week allowed by ACGME. Dr. Shin chose to work these long hours "to compensate for [his] problems" and get the essential functions of the job completed. S.J.A. 116. Thus, although there is some evidence in the record to support the view that Dr. Shin often worked over eighty hours and that his performance was affected by these long hours, we find that the work hours were necessitated by the disability, not by UMMSC.

Moreover, we recognize that Appellees tried to correct the problem. As Dr. Strait explained, "[b]ecause Frank would many times stay after he was supposed to leave, . . . [w]e tried and (Continued)

that, while at UMMSC, Dr. Shin provided "safe and appropriate care" for patients "with efficiency and reasonable autonomy." J.A. 192-93.

## B.

We next consider Dr. Shin's alternative argument that he could have performed his job's essential functions if reasonable accommodations had been made. The ADA states that "'reasonable accommodation' may include . . . job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). The plaintiff bears the burden of identifying an accommodation that would allow a qualified individual to perform the job, as well as the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable. Halperin v. Abacus Tech. Corp., 128 F.3d 191, 197 (4th Cir. 1997).

Dr. Shin argues that he would have been able to perform the essential functions of his job had Appellees: (1) reduced the number of patients for whom he was responsible; (2) provided him

---

we would force him to leave." S.J.A. 262. At one point, the "Friends of Frank" would page him every day at approximately 6 p.m. to remind him to go home and would even volunteer to take care of his incomplete work. Likewise, Appellees would not allow Dr. Shin to take a clinic -- a requirement of the internship -- so that he would not violate the eighty hour restriction.

23

additional time to record and synthesize information when presentations were given from the night float team; and (3) staffed a nurse practitioner while he was on call. Appellees respond that Dr. Shin was given every possible accommodation to perform the essential functions of his job, and that "there were no additional, reasonable accommodations that would have allowed [Dr. Shin] to perform the essential functions of a resident." Appellees' Br. at 56. We agree with Appellees.

The record shows that ACGME requires UMMSC to show that its first year residents admit a minimum of 210 patients per year. This requirement exists to provide residents with "direct clinical experience with progressive responsibility for patient management." S.J.A. 67. Moreover, "any reduction in [Dr. Shin's] workload for number of patients that [he] admit[s] or care[s] along the continuum of care would become the responsibility of supervising residents on the team." S.J.A. 68. As a consequence, Appellees argue that "[p]atient safety and resident morale [would] be compromised since others [would] be required to assume a greater role in managing those cases that [Dr. Shin] would be routinely expected to manage, diluting or delaying their routine responsibilities." S.J.A. 68.

Dr. Shin offers no evidence to rebut these facts. He also fails to show how handling a reduced volume of patients would satisfy his job's essential functions. As the district court

24

noted, "[t]he ADA does not require an employer to assign an employee to 'permanent light duty,'" J.A. 192 (quoting Carter v. Tisch, 822 F.2d 465, 467 (4th Cir. 1987)); nor does it require an employer to "reallocate job duties in order to change the essential functions of a job," 29 C.F.R. Pt. 1630 App. § 1630.2(o), or "hire an additional person to perform an essential function of a disabled employee's position," Martinson v. Kinney Shoe Corp., 104 F.3d 683, 687 (4th Cir. 1997). See also Laurin v. Providence Hosp., 150 F.3d 52, 60-61 (1st Cir. 1998); Milton v. Scrivner, Inc., 53 F.3d 1118, 1125 (10th Cir. 1995) ("An accommodation that would result in other employees having to worker [sic] harder or longer hours is not required.").

More importantly, Dr. Shin has failed to provide evidence showing that "light duty" was an option for medical interns and residents at UMMSC. The record shows the contrary. Dr. Thomas C. Goldman opined that a reduced patient load is "not reasonable, in that [it] could not be offered without seriously compromising the functions of the hospital, the needs of the staff, and patient safety." S.J.A. 423. Similarly, Dr. Holly J. Humphrey explained that Dr. Shin's requested accommodations are "not only unreasonable but in direct conflict with the goal of residency education -- to build memory strength about patient care disease presentations in order to develop the clinical

25

judgment essential to being a physician." S.J.A. 172. She further explained that "[g]iven that the goals of residency training are to develop competency, the doctor must function at a level allowing complex problem solving including simultaneously managing multiple patient care situations and dealing with ambiguity." S.J.A. 173. Because Dr. Shin provided no evidence to bring this fact into dispute, and we can find none, we defer to the views of Appellees on the standards for professional and academic achievement. See Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1266 (4th Cir. 1995) ("We are reluctant under these circumstances to substitute our judgment for that of UMMSC."); see also McGregor v. La. State Univ. Bd. of Supervisors, 3 F.3d 850, 859 (5th Cir. 1993) (deferring to a law school's determinations on how best to meet the ABA's accreditation requirement on attendance); Zukle v. Regents of Univ. of Cal., 166 F.3d 1041, 1048 (9th Cir. 1999) (making a similar finding in the medical school context). For the above reasons, we reject Dr. Shin's alternative argument. No reasonable jury could conclude that a reduced patient load was a reasonable accommodation under these circumstances.

Accordingly, we conclude that the district court did not err in finding that Dr. Shin is not a qualified individual with a disability under the ADA. Dr. Shin was not able to perform the essential functions of his job without reasonable

26

accommodation, and the accommodations he identified are unreasonable in light of the circumstances.

## III.

For the reasons set forth above, the district court's order granting Appellees' motion for summary judgment is

AFFIRMED.

27