Paula CRABILL, Plaintiff,

v.

CHARLOTTE–MECKLENBURG BOARD OF EDUCATION, Defendant.

Civil Case No. 3:08cv598.

United States District Court, W.D. North Carolina, Charlotte Division.

April 14, 2010.

Mason G. Alexander, Margaret M. Kingston, Fisher & Phillips, Charlotte, NC, for defendant.

S. Luke Largess, Tin, Fulton, Walker & Owen, Charlotte, NC, for plaintiff.

## MEMORANDUM OF DECISION AND ORDER

MARTIN REIDINGER, District Judge.

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment [Doc. 19] and the Plaintiff's Motion for Partial Summary Judgment [Doc. 21].

## I. PROCEDURAL BACKGROUND

On November 12, 2008, the Plaintiff Paula Crabill initiated this action in Mecklenburg County Superior Court, asserting that the Defendant Charlotte–Mecklenburg Board of Education ("CMS") violated the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* when it failed to accommodate her medical conditions and otherwise discriminated against her due to her conditions. [Complaint, Doc. 8]. On December 23, 2008, the Defendant removed the action to this Court on the basis of federal question jurisdiction. [Doc. 1].

Discovery in this action concluded on December 30, 2009. The Defendant filed its Motion for Summary Judgment on January 28, 2010, arguing that the Plaintiff's claims are untimely and barred by the applicable statute of limitations. Alternatively, the Defendant moves for summary judgment on the ground that no genuine issue of material fact exists and that the Defendant is entitled to judgment as a matter of law regarding the Plaintiff's claims under the ADA. [Doc. 19]. After receiving an extension of time to do so, the Plaintiff filed a Motion on January 31, 2010, seeking partial summary judgment as to the Defendant's liability on her claims under the ADA. [Doc. 21]. The parties filed their respective Responses on

February 16, 2010 [Docs. 28, 29], and their respective Replies on February 26, 2010 [Docs. 31, 32].

Having been fully briefed, these motions are now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 519 (4th Cir.2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat,* 346 F.3d at 522. If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. *Id.*

A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. Furthermore,

neither unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ oh a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

*Id.* (internal citations and quotation marks omitted). Nonetheless, in considering the facts for the purposes of a summary judgment motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where, as here, the parties have filed cross-motions for summary judgment, the Court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n. 4 (1st Cir.1997)).

## III. FACTUAL BACKGROUND

### A. Plaintiff's Medical Conditions

The Plaintiff suffers from a variety of medical conditions, including Chiari Malformation[1], lupus, fibromyalgia, arthritis, sleep apnea, and eye problems. [Deposition of Paula Crabill ("Crabill Dep."), Doc. 19–5 at 13–14]. The Plaintiff's Chiari Malformation is the medical condition at the center of her allegations against the Defendant. [*See* Complaint, Doc. 8–1 at ¶¶ 11–80]. The Plaintiff was diagnosed

with Chiari Malformation in May of 2003. [Crabill Dep., Doc. 19–5 at 17]. As a result of this condition, the Plaintiff experiences symptoms of fatigue, weakness, numbness and tingling in her extremities, dizziness, slurred speech, vision problems, and difficulty processing thoughts and finding words. [*Id.* at 21; Medical Records of Dr. Rao, Doc. 22–6].

### B. Plaintiff's Employment and Requests for Accommodations

The Plaintiff was employed for nearly thirty years as a guidance counselor in the Union County and Charlotte–Mecklenburg public school systems at all school levels— elementary, middle school, and high school. [Application for Employment, Doc. 22–1]. In September 1998, the Plaintiff began working as a guidance counselor at Myers Park High School ("Myers Park") in Mecklenburg County. [Employment Contract, Doc. 22–2]. The Plaintiff consistently scored "Above Standard" to "Well Above Standard" on her employee evaluations while at Myers Park. [Employee Evaluations, Doc. 22–3].

As a guidance counselor, the Plaintiff was responsible for providing direct counseling services to the student population. [Crabill Dep., Doc. 19–5 at 22]. Myers Park utilized an alphabetical system for assigning student caseloads to each counselor. [*Id.* at 32, 33]. As a general rule, a guidance counselor would be assigned a section of the alphabet and would counsel those students whose surnames fell in that part of the alphabet. [*Id.*] In some years, specific student populations—such as International Baccalaureate ("IB") students or students for whom English was a second language would be assigned to a coun-

---

**1.** Chiari Malformation is a condition in which the tonsils of the cerebellum descend out of the base of the skull, impeding the flow of cerebral spinal fluid and causing numerous debilitating symptoms. [*See* Doc. 22–8].

selor without regard to the alphabet. [*Id.* at 24, 33–34]. In addition to counseling students, each guidance counselor was required to perform certain tasks, such as middle school registration and College Night. [*Id.* at 23–24].

Bill Anderson became the principal at Myers Park in June 2002. [Deposition of Bill Anderson ("Anderson Dep."), Doc. 19–7 at 4–5]. At the beginning of the 2002–03 school year, there were only three guidance counselors including the Plaintiff. Anderson hired three new counselors, bringing the total number to six. [*Id.* at 6].

During the 2002–03 school year, the Plaintiff was the interim chair of the school's guidance department. [Crabill Dep., Doc. 19–5 at 28]. The Plaintiff asked Anderson repeatedly throughout the year for a reduced student caseload because of her administrative duties as department chair. [*Id.* at 31]. She provided Anderson with some information indicating that other CMS high schools followed this practice. [Crabill Dep. Exs. 19, 20, Doc. 19–6 at 44–45]. Anderson refused to reduce the Plaintiff's caseload mid-year, so as not to disrupt the students' relationships with their counselors. [Anderson Dep., Doc. 19–7 at 9]. He explained in his deposition that he also rejected the Plaintiff's request because he wanted to observe the functioning of the school during his first year as principal and did not want to implement many changes at that time. [*Id.* at 13].

In the spring of 2003, the Plaintiff asked to be relieved of the position of department chair for the following school year. [Crabill Dep., Doc. 19–5 at 28–29]. In June 2003, Anderson asked the Plaintiff about having two other counselors, Vicki Brunnick and Joan Rolston, be the co-chairs for the following year. [*Id.* at 30]. The Plaintiff had no objection to this ar-rangement. [*Id.*]. After observing the way the guidance department had operated during his first year as principal, Anderson reduced the new co-chairs' student caseloads to reflect their additional administrative duties. [Anderson Dep., Doc. 19–7 at 13–14].

In June 2003, the Plaintiff told Anderson about her diagnosis of Chiari Malformation and asked him for some accommodations—namely, a reduced student caseload, not carrying heavy materials, and not driving in the dark or on ice or snow. [Anderson Dep. Exs. 14, 15, Doc. 22–11]. Anderson responded positively to providing the Plaintiff with any accommodations to address her difficulties with driving and with carrying heavy items. Regarding a reduced caseload, however, Anderson indicated that they would have to wait and see how many counselors they would have the following year. [Crabill Dep. Ex. 9, Doc. 19–6 at 41].

In an email dated July 23, 2003, the Plaintiff again requested a reduced student caseload, explaining that her doctor had said that her work demands exacerbated her condition. [Crabill Dep., Doc. 19–5 at 35–36]. Anderson responded the next day, explaining that the decision regarding the allocation of students would have to be made in conjunction with the guidance department co-chairs. [Crabill Dep. Ex. 10, Doc. 19–6 at 42; Anderson Dep., Doc. 19–7 at 17–18].

After the Plaintiff broached the subject of a reduced caseload with Anderson again a few days later, Anderson responded to the Plaintiff by email, stating that he was "very frustrated" with her "continued obsession/perseverance over [the co-chair's] caseload and the fairness of her numbers," and that he hoped that "in the future you will spend your precious time and energy serving our students, parents, and staff

members more efficiently and effectively." [Anderson Dep. Ex. 23, Doc. 29–7 at 8].

In August 2003, the Plaintiff provided a note to Anderson from her treating neurologist, Dr. Rao, stating that the Plaintiff's caseload needed to be kept at "a minimum[2] of 250–300" students due to her medical condition. [Crabill Dep., Doc. 19–5 at 39; Crabill Dep. Ex. 16, Doc. 19–6 at 43]. Although this range was significantly lower than the then-average caseload of 422 students per counselor at Myers Park, it was approximately the average case load for all high school guidance counselors within CMS. [See Anderson Dep. Ex. 6, Doc. 22–15 at 2].

For the 2003–04 school year, Anderson developed a matrix in order to divide the guidance counselors' additional, "extracurricular" duties more equitably among the counselors. [Anderson Dep., Doc. 7–8, 15]. The system attributed points to these additional duties to warrant reductions in case loads for counselors involved in the more time-consuming of these duties. [Anderson Dep., Doc. 22–61 at 25–26]. Anderson provided the Plaintiff the accommodation of not having to perform any duties after regular school hours. [Anderson Dep., Doc. 7–8 at 15]. The additional duties that were assigned to the Plaintiff involved minimal time and could be performed during the regular workday. [*Id.* at 7–8, 15, 24–25]. As a result of fewer, less time-consuming additional activities being assigned to her, the Plaintiff's student caseload was higher than most other counselors. [Anderson Dep., Doc. 22–61 at 24].

In November 2003, an additional counselor was added to the guidance department at Myers Park. [Crabill Dep., Doc. 19–5 at 30]. As a result, the caseloads of all of the other Myers Park counselors, including the Plaintiff, were reduced during that school year. [*Id.*].

In the summer of 2004, the Plaintiff asked Vicki Brunnick, the co-chair of the guidance department, if she could be assigned the 9th and 10th grade IB students for the upcoming school year, as this assignment would have reduced the need for the Plaintiff to do extensive typing of seniors' college recommendation letters. [Deposition of Vicki Brunnick ("Brunnick Dep."), Doc. 22–62 at 3–4; Brunnick Dep. Ex. 5, Doc. 22–17]. Brunnick told the Plaintiff she would have to ask Anderson, as the principal would have to make that kind of decision. [Brunnick Dep., Doc. 22–62 at 3–4]. Brunnick, however, did not speak to Anderson about this, and Anderson gave the assignment to a new hire, Heather Schiffman, instead. [*Id.* at 6]. The Plaintiff, however, was later asked to make the caseload division among the counselors for the 2004–05 school year, and the Plaintiff made no complaints about her caseload during this school year. [Crabill Dep. Ex. 89, Doc. 19–6 at 55; Complaint, Doc. 8–1].

In the spring of 2005, the Plaintiff applied for a transfer to two middle schools that were closer to her home and had smaller case loads. [Crabill Dep., Doc. 19–5 at 41–42 and Doc. 19–6 at 39]. The Plaintiff discussed her transfer request with Anderson, but asked him not to tell the principals of these schools about her medical condition or her need for any ac-

---

**2.** The Plaintiff contends that Dr. Rao meant to state in this note that her caseload should be *at a maximum* 250–300 students and that his use of the word "minimum" was simply an error. This appears to be how the parties interpreted Dr. Rao's note. [*See* Email,

Anderson Dep. Ex. 32, Doc. 19–7 at 29] ("I received a copy of your doctors [sic] note today that specified that you can no longer have a caseload over 250–300 students per year.").

commodations. [Crabill Dep., Doc. 19–5 at 42]. The Plaintiff contacted Human Resources about her request for a transfer but never received any response. [*Id.* at 43]. She did not get a position at either school.

During the 2005–06 school year, the Plaintiff was responsible for the additional duties of the "Future Center" and "Summer Ventures." [Anderson Dep., Doc. 19–7 at 24–25; Crabill Dep. Ex. 35, Doc. 19–6 at 46]. These two duties were not very time-consuming and did not require after-school or evening duties like some of the other additional activities that guidance counselors were expected to perform. [Anderson Dep., Doc. 19–7 at 26–27]. The Plaintiff did, however, end up with the largest numbers of students, and particularly seniors, in her caseload. That year, five other counselors had fewer than 300 students— the number that the Plaintiff previously had requested to have assigned to her. In October 2005, one counselor went on maternity leave and her student caseload was distributed among the other counselors, adding over 35 students to the Plaintiff's load. [Plaintiff's Discovery Responses, Doc. 22–19].

In November 2005, the Plaintiff sent Anderson a new medical note from her doctor confirming that she was still being treated for Chiari Malformation and experiencing symptoms of "weakness, parasthesia, & ataxia" that could increase with stress. [Doc. 22–14]. The Plaintiff also sent another copy of the 2003 medical note from her doctor stating that she should have a "minimum" caseload of 250–300 students. [Anderson Dep. Ex. 32, Doc. 19–7 at 29]. In response, Anderson sent the Plaintiff an email, which stated as follows:

I received a copy of your doctors [sic] note today that specified that you can no longer have a caseload over 250–300 students per year. Since there are no high school counselor positions that have fewer than 250 students in their caseload would you like me [to] begin searching for a transfer to a CMS middle school for you? Please advise before I start the paperwork on the medical transfer to a middle school.

[*Id.*]. The Plaintiff responded to Anderson's email as follows:

No, that was an old doctor's note from 2003. I was just giving it to you for your file, in case you did not have the old one. The new note was describing the condition. *I do not want a transfer.*

[*Id.*] (emphasis added). The Plaintiff subsequently explained in her deposition that she stated that she did not wish to transfer because she viewed Anderson's response "as an angry reaction." [Crabill Dep., Doc. 19–5 at 45].

In November 2005, the Plaintiff asked Lin Shropshire, the chair for the guidance department for the 2005–06 school year, whether her medical note had been considered in calculating her caseload. Shropshire responded in an email that the Plaintiff needed to "stop spending our (yours and mine) precious time" worrying about caseload numbers. [Plaintiff's Discovery Response, Doc. 22–23; Anderson Dep. Ex. 35, Doc. 22–24].

In late November 2005, Tom Spivey replaced Anderson as principal of Myers Park. [Deposition of Tom Spivey ("Spivey Dep."), Doc. 19–8 at 4]. Before Anderson left his position as principal, Anderson emailed Spivey to warn him that the Plaintiff would likely ask for a reduction of her caseload "because of her so called 'medical' problems." [Anderson Dep. Ex. 31, Doc. 22–26]. Anderson strongly recommended that Spivey not reduce her caseload because the Plaintiff was very inefficient with her time management and enjoyed whining about being overworked. Anderson further noted that reducing the Plaintiff's

caseload would cause morale problems with the other counselors. [*Id.*].

The Plaintiff first spoke to Spivey about her medical condition in March 2006. [Crabill Dep., Doc. 19–5 at 48]. About two weeks later, the Plaintiff received an envelope in the CMS courier system with no return address and no cover letter but which contained a brochure for a seminar called "Managing Emotions and Thriving Under Pressure." [Anderson Dep. Ex. 36, Doc. 22–30]. Certain phrases in the brochure had been highlighted, such as "self-defeating emotions, behaviors and habits" and "stop getting worked up over little things." The only identifying mark on the brochure was the original mailing address, which was Bill Anderson's new office. [*Id.*]. Spivey recalled that the Plaintiff came to him very upset about the brochure and told him that it appeared to have come from Anderson. [Spivey Dep., Doc. 22–64 at 3–4]. He tried to console her and told her that he would do "everything in [his] power" to address the matter internally. He admitted, however, that he never found out anything more about the incident. [*Id.* at 4].

On July 26, 2006, Shropshire sent an email to Spivey proposing that the matrix for assigning extra duties be abolished and that these duties should be distributed more evenly among the guidance counselors. [Spivey Dep. Ex. 11, Doc. 22–33]. She noted that when "one counselor learned of the rubric and then told the others that some of them had larger caseloads than others, it created some animosity." [*Id.*].[3] Spivey agreed with Shropshire's recommendation. [*Id.*]. Shropshire subsequently made case load distributions that gave the Plaintiff approximately 20 more students than the department average of 362. [Spivey Dep. Ex. 12, Doc. 22–34].

In July 2006, the Plaintiff wrote Spivey a letter requesting three specific accommodations: (1) a flexible work schedule that would allow her to "alter [her] schedule for just an hour or two in a day to allow to rest or adjust" and to "adjust [her] schedule to fit [her] medical needs"; (2) a cap on her student caseload as close to 300 students as possible; and (3) voice recognition software for typing. [Crabill Dep. Ex. 50, Doc. 19–6 at 48]. At the time the Plaintiff wrote this letter she was aware that Spivey was about to go on vacation. [*Id.* at 47]. By the time that Spivey received and read this letter in mid-August 2006, all of the counselor caseload assignments for the upcoming school year had already been set by Shropshire. [*Id.;* Spivey Dep., Doc. 19–8 at 5].

In September 2006, Shropshire and Brunnick requested a meeting with Spivey and other administrators to discuss departmental concerns about the Plaintiff. [Spivey Dep. Ex. 15 Doc. 22–38]. The Plaintiff claims that she became so anxious at being attacked verbally in this meeting that she experienced what she thought was a heart attack and remained out of school for a week. [*See* Doc. 21–1 at 12]. When the Plaintiff returned to work, Spivey met with her and reviewed her medical documentation. The Plaintiff provided Spivey with another doctor's note stating that she would be benefit from a reduction in her caseload. [*Id.* at 7]. On October 9, 2006, Spivey emailed the CMS Human Resources Department for guidance on how to address the Plaintiff's request for a workload reduction, noting that "[i]t would be hard to reduce workloads as I would

---

**3.** The Plaintiff contends that the "one counselor" referred to in Shropshire's email was the Plaintiff [*see* Doc. 21–1 at 11], but there is no evidence in the record to confirm this contention.

just be adding students to another counselor." [Spivey Dep. Ex. 20, Doc. 19–8 at 22]. Human Resources requested a copy of the doctor's note to review. [*Id.*].

On October 17, 2006, the Plaintiff injured her back when she slipped on a puddle of water inside the school and fell. [Crabill Dep., Doc. 19–6 at 3; Injury Report, Spivey Dep. Ex. 21, Doc. 19–8 at 23]. The Plaintiff received medical treatment, including physical therapy, as a result of this accident. [Crabill Dep., Doc. 19–6 at 4]. When the Plaintiff returned to work, she heard rumors that she was going to be transferred because of her medical problems. [Plaintiff's Discovery Submissions, Doc. 22–44]. Plaintiff's counsel responded to this by sending a letter to CMS Human Resources threatening to seek an injunction if CMS attempted to transfer the Plaintiff to another school. [Largess Letter, Doc. 19–10 at 3].

On November 17, 2006, Human Resources contacted Spivey regarding the Plaintiff and specifically asked if the alphabetic distribution of students between counselors could not be rotated so that no one counselor had the largest grouping every year. [Spivey Dep. Ex. 23, Doc. 19–8 at 24]. Spivey responded that a rotation could work, although they preferred to keep counselors with students for multiple years. He further noted that the Plaintiff was currently out on leave due to her fall, and that with "all her other absences and lateness to work due to medical reasons her department is upset and falling apart." [*Id.*]. Spivey stated that he believed the Plaintiff needed to be transferred to an elementary or middle school where she could have later hours and a smaller caseload, as the Plaintiff apparently could no longer "handle the demands placed on a high school counselor due to her medical limitations." [*Id.*].

On April 12, 2007, Regina George of the CMS Human Resources Department spoke with the Plaintiff about her requests for accommodation. [Crabill Dep., Doc. 19–6 at 5]. George subsequently wrote a letter to the Plaintiff asking for additional information regarding her accommodation requests. [*Id.* at 5–6]. The Plaintiff had a follow-up meeting with George on June 11, 2007. [*Id.* at 6]. In preparation for this meeting, the Plaintiff made a list of specific accommodations she required, including: (1) a flexible work schedule allowing her to modify her schedule as needed; (2) regular work breaks; (3) a cap on student caseload; (4) a strict limit on additional duties such as middle school registration and orientation; and (5) voice recognition software. [Crabill Dep. Ex. 74, Doc. 19–6 at 54].

For the 2007–08 school year, the Plaintiff received 379 students in her caseload, which was the average number of students that all of the guidance counselors at Myers Park received. [Spivey Dep. Ex. 33, Doc. 22–53]. The Plaintiff was still expected to attend nighttime activities, such as the fall open house. [Spivey Dep. Ex. 34, Doc. 22–54].

On January 10, 2008, Dr. Rao wrote a letter recommending that Plaintiff stop working effective immediately, stating that her symptoms had worsened in the fall semester and that she risked "irreversible neurological damage." [Spivey Dep. Ex. 4., Doc. 22–55]. The Plaintiff went out on disability leave in mid-January 2008. She remains out of work on disability leave and receives disability checks from the Defendant. [Crabill Dep., Doc. 19–6 at 40].

### C. Plaintiff's Charge of Discrimination and Right–to–Sue Notice

The Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February

20, 2007. [Doc. 8–1 at ¶ 67]. The EEOC Case Log reflects that an EEOC investigator met with the Plaintiff's counsel on April 3, 2008. [EEOC Case Log, attached to Declaration of Reuben Daniels ("Daniels Decl."), Doc. 19–4 at 5].[4] The EEOC Case Log further indicates that on April 22, 2008, the right-to-sue letter was mailed to the Plaintiff and the Defendant. [*Id.*]. No copy was mailed to the Plaintiff's attorney. Nothing in the Case Log indicates that the letter was returned, unable to be delivered or otherwise not received by the Plaintiff. [Daniels Decl., Doc. 19–4 at ¶ 3]. The Defendant received a copy of the right-to-sue letter in the normal course of business. [Affidavit of John Brady ("Brady Aff."), Doc. 19–2 at ¶ 2]. The Plaintiff, however, states that she did not receive a copy of the right-to-sue letter until September 19, 2008, after her attorney had contacted the EEOC and learned that the right-to-sue letter had been mailed on April 22, 2008. [Declaration of Paula Crabill ("Crabill Decl."), Doc. 21–2 at ¶¶ 22, 25]. The Plaintiff thereafter commenced the present action on November 12, 2008. [Complaint, Doc. 8–1].

In a Declaration submitted in support of her Motion for Partial Summary Judgment, the Plaintiff states that she lives in a rural part of Union County and receives her mail at a mailbox at the roadside in front of her home. [Crabill Decl., Doc. 21–2 at ¶ 4]. It is not unusual for her to receive mail belonging to other households. [*Id.* at ¶ 5]. The Plaintiff was home the week of April 21, 2008, and checked the mail every day of that week checking for test results from her doctor's office. [*Id.* at ¶ 6]. The Plaintiff routinely checks her mailbox every day and has continued to do so since April 21, 2008. [*Id.* at ¶¶ 6, 13]. She went out of town on May 6 and 7, 2008, and brought in her mail when she returned on May 8. [*Id.* at ¶ 15]. Although she left town for brief periods over the next few months, she always had the post office to hold her mail until she returned. [*Id.* at ¶ 16]. The Plaintiff further states that she was interested in the status of her EEOC charge and would have opened any communication from the EEOC had she received one. [*Id.* at ¶ 17].

After the Plaintiff's attorney met with an EEOC investigator on April 3, 2008, the Plaintiff emailed her attorney regularly over the next several months to see if he had received any response from the EEOC. Each time her attorney responded that he had not received any information. [*Id.* at ¶ 21]. On August 27, 2008, the Plaintiff learned from her attorney that the EEOC had issued the right-to-sue letter on April 22, 2008. [*Id.* at ¶ 22].

## IV. ANALYSIS

### A. Timeliness of ADA Claims

A charging party has 90 days from the day of receipt of the EEOC right-to-sue letter within which to file an action in federal court. 42 U.S.C. § 2000e–5(f)(1). Determining the date on which the Plaintiff received the EEOC letter is therefore critical in determining when this 90–day period began to run. *See Nguyen v. Inova Alexandria Hosp.,* No. 98–2215, 1999 WL 556446, at *3 (4th Cir. July 30, 1999).

 The Fourth Circuit has held that delivery of notice of a right-to-sue letter to a plaintiff's home triggers the limitation period even if the plaintiff herself did not

---

4. The EEOC Case Log states "meet with CP [Charging Party] attorney/PDC," which the Defendant construes to mean that the EEOC investigator met with Plaintiff's counsel *and* the Plaintiff on April 3, 2008. [Doc. 20 at 2].

The Plaintiff denies that she attended this meeting with her attorney. [Second Declaration of Paula Crabill ("Crabill 2d Decl."), Doc. 29–3 at ¶ 2]. The Court finds this factual dispute to be immaterial to the issues at hand.

actually receive the letter. *See Watts–Means v. Prince George's Family Crisis Ctr.,* 7 F.3d 40, 42 (4th Cir.1993) (holding that postal service's notice to claimant of certified letter being held at post office triggered 90–day period); *Harvey v. City of New Bern Police Dep't,* 813 F.2d 652, 654 (4th Cir.1987) (holding that wife's receipt of EEOC letter triggered statutory period); *Harper v. Burgess,* 701 F.2d 29, 30 (4th Cir.1983) (per curiam) (holding that notice to plaintiff's counsel triggered statutory period); *Nguyen,* 1999 WL 556446, at *3 (holding that EEOC letter, which was delivered to claimant's home and picked up by a designated neighbor constituted notice triggering limitations period). If there is evidence confirming the actual date of delivery, then that date governs. *Dixon v. Digital Equip. Corp.,* No. 92–1483, 1992 WL 245867, at *1 (4th Cir. Sep. 30, 1992). When the date of receipt is unknown, the Court presumes that service by regular mail was received within three days of the date of mailing. *Nguyen,* 1999 WL 556446, at *3.

■ The 90–day filing requirement "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). The Fourth Circuit requires district courts to engage in a "case-by-case examination to determine if an equitable tolling of the filing period is appropriate." *Harvey,* 813 F.2d at 654. The Fourth Circuit has cautioned, however, that equitable tolling is available only in "those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Rouse v. Lee,* 339 F.3d 238, 246 (4th Cir.2003) (en banc) (quoting *Harris v. Hutchinson,* 209 F.3d 325, 330 (4th Cir.2000)).

■ In the present case, the Defendant has presented evidence indicating that the EEOC letter was mailed to the Plaintiff on April 22, 2008. There is no indication in the EEOC's records that the letter was returned, unable to be delivered or otherwise not received by the Plaintiff. Applying the three-day rule, the Court presumes that the letter was delivered to the Plaintiff on April 25, 2008. Thus, the 90–day limitations period ended on July 24, 2008, and the Plaintiff's Complaint was therefore untimely filed.

■ Having determined that the Plaintiff's filing was not timely, the Court must next consider whether "an equitable tolling of the filing period is appropriate." *Harvey,* 813 F.2d at 654. Upon carefully considering the record, and in particular the Plaintiff's Declaration, the Court concludes that such reasonable grounds do exist in this case. The Plaintiff has sworn under oath that she was home the entire week of April 21, 2008, and checked the mail every day of that week. She further attests that she routinely checks her mailbox every day; that she went out of town on May 6 and 7, 2008, and brought in her mail when she returned on May 8; and that although she left town for brief periods over the next few months, she always had the post office to hold her mail until she returned. This testimony establishes that the Plaintiff was extremely diligent in checking her mail for any correspondence from the EEOC.

Additionally, the Plaintiff was diligent in maintaining contact with her counsel regarding the status of her case. She emailed her attorney regularly during this time period to see if he had received any response from the EEOC. Unknown to the Plaintiff and her counsel, however, the EEOC mailed a copy of the right-to-sue

letter only to the Plaintiff and not to the Plaintiff's counsel. The Fourth Circuit has noted that "it is not at all unreasonable for a layperson who has retained counsel to assume that all further matters will be handled by her attorney." *Coleman v. Talbot County Det. Ctr.*, 242 Fed.Appx. 72, 74 (4th Cir.2007) (applying equitable tolling where claimant failed to notify EEOC of new address but EEOC failed to provide copy of right-to-sue letter to claimant's attorney).

In sum, the Plaintiff has presented sufficient evidence of circumstances "beyond [her] control or external to [her] own conduct . . . that prevented [her] from filing on time." *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir.2004). Under these circumstances, the Court concludes that the Plaintiff is entitled to the benefit of equitable tolling. Thus, her Complaint—although filed more than 90 days after issuance of the right-to-sue letter—shall be deemed timely, and the Court will proceed to consider the merits of her claims.

## B. ADA Discrimination Claim

■ The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "'Discrimination' as used in the ADA prohibits not only disparate treatment because of an employee's disability, but also the failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . .'" *Shin v. Univ. of Md. Med. Sys. Corp.*, No. 09–1126, 369 Fed.Appx. 472, 479, 2010 WL

850176, at *5 (4th Cir. Mar. 11, 2010) (internal citations omitted). In the present case, the Plaintiff alleges that the Defendant discriminated against her by failing to provide reasonable accommodations for her disability, either at Myers Park or in moving the Plaintiff to another school where her medical needs could be accommodated. [Complaint, Doc. 8–1 at ¶ 84].

■ In order to establish a claim for failure to provide reasonable accommodation, the Plaintiff must show (1) that she is a "qualified individual with a disability" within the meaning of the ADA; (2) that her employer had notice of her disability; (3) that with reasonable accommodation, she could perform the essential functions of her position; and (4) that her employer refused to make such accommodations. *See Rhoads v. FDIC*, 257 F.3d 373, 387 n. 11 (4th Cir.2001).

The ADA defines a "qualified individual" as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). For the purpose of these motions for summary judgment, the Defendant does not contest that the Plaintiff is a "qualified individual" within the meaning of the ADA. Nor does the Defendant contest that it had notice of the Plaintiff's disability. Thus, the Plaintiff has satisfied the first and second elements of her claim.

■ The Defendant does dispute, however, whether the Plaintiff could perform the essential duties of her job with "reasonable accommodation." The ADA states that "'reasonable accommodation' may include . . . job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position. . . ." 42 U.S.C. § 12111(9)(B). The "Plaintiff bears the burden of demonstrating that she could perform the essential functions of

her job with reasonable accommodation." *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir.1994). "Once the plaintiff has met [her] burden of proving that reasonable accommodations exist, the employer may present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer." *Lamb v. Qualex, Inc.*, 33 Fed.Appx. 49, 59 (4th Cir.2002) (citing 42 U.S.C. § 12112[b)(5)(A)).

The Plaintiff contends that she could have performed the essential functions of her job had the Defendant provided the following accommodations to her: (1) a reduced caseload of no more than 300 students; (2) the elimination of additional counselor duties; (3) a flexible work schedule; (4) regular work breaks; and (5) voice recognition software. Alternatively, the Plaintiff argues that the Defendant could have accommodated her disability by transferring her to another school. The Defendant responds that the requested accommodations were not reasonable and created an undue burden on the operation and function of the guidance department. With respect to the Plaintiff's suggestion of a transfer, the Defendant contends that such an accommodation was offered to the Plaintiff but was rejected. The Court will address each of these contentions in turn.

■ The Plaintiff first argues that the Defendant should have limited her student caseload to a specific number or range and limited or eliminated altogether her "additional" counselor duties. The forecast of evidence shows that counseling students and performing additional duties, such as middle school registration and College Night, are essential functions of a guidance counselor's job. [*See* Crabill Dep., Doc. 19–5 at 22, 26–27]. The ADA does not require an employer to assign an employee to "permanent light duty," *Carter v. Tisch*, 822 F.2d 465, 467 (4th Cir.

1987); nor does the ADA require an employer to reallocate essential job functions. *See* 29 C.F.R. Pt. 1630 App. (discussing 29 C.F.R. § 1630.2(*o* )). Moreover, reducing the Plaintiff's workload, either by reducing the number of students assigned to her and/or by eliminating her "additional" duties merely would have shifted these duties to other counselors in the department, thereby increasing their workload. "[A]n accommodation that would require other employees to work harder is unreasonable." *Mason v. Avaya Communications, Inc.*, 357 F.3d 1114, 1121 n. 3 (10th Cir.2004); *Shin*, 369 Fed.Appx. at 482, 2010 WL 850176, at *8 (finding first year medical resident's request for reduced patient caseload was not reasonable accommodation under the ADA). Moreover, a reduction in the Plaintiff's caseload and the corresponding increase in the caseloads of the other counselors in the department would have disrupted services to all Myers Park students. [Spivey Aff., Doc. 19–9 at ¶ 4]. For these reasons, the Court concludes that no reasonable jury could find that the Defendant was obligated to provide these accommodations to the Plaintiff.

■ Next, the Plaintiff asserts that the Defendant should have allowed her to have maintained a flexible work schedule to allow her to come in later during the day, if necessary, to fit her medical needs. Assuming that the Plaintiff's request for a flexible work schedule was reasonable, the forecast of evidence shows that providing this accommodation would have amounted to an undue hardship on the Defendant. The Plaintiff's job was to counsel students. The Plaintiff, like the rest of the guidance counselors in her department, had a work schedule which coincided with the time that the students were present in school on any given day. To the extent that the Plaintiff was not present during regular

school hours, her ability to perform the essential function of her job would be diminished. Furthermore, to the extent that any students assigned to her required counseling services while she was absent, other counselors in the department would then be required to meet those students' needs, in addition to the needs of the other students already assigned to them. This additional burden on the Plaintiff's co-workers would have disrupted the counseling services provided to all of Myers Park's students [Spivey Aff., Doc. 19–9 at ¶ 4]. *See* 29 C.F.R. § 1630.2(p)(2)(v) (impact on other employees' ability to perform duties is relevant factor in determining undue hardship).

■ The Plaintiff further contends that the Defendant should have granted her request for regular work breaks. In this regard, however, the Plaintiff was requesting something that she already had the ability to do. She did not have to ask permission to take breaks, as she made her own daily schedule and could decide when to schedule student appointments. [Crabill Dep., Doc. 19–6 at 10–11]. As such, there was no accommodation required under the ADA to address this particular request of the Plaintiff.

■ The Plaintiff also requested that the Defendant provide her with voice recognition software so as to reduce the amount of typing that she had to perform. The forecast of evidence shows that the Plaintiff purchased this software and that she was reimbursed for this expense. [Spivey Dep., Doc. 22–64 at 17]. Accordingly, this particular accommodation was satisfied by the Defendant.

■ Alternatively, the Plaintiff contends that the Defendant could have accommodated her medical needs by transferring her to another school where she could have had fewer duties and a reduced

caseload. The forecast of evidence, however, establishes that several times throughout her tenure at Myers Park, the Plaintiff expressly rejected the idea of a medical transfer. For example, when the Plaintiff applied to two other schools in the spring of 2005, she asked Anderson not to not to tell the principals of these schools about her medical condition or her need for any accommodations for her condition. [Crabill Dep., Doc. 19–5 at 42]. In November 2005, when Anderson suggested a transfer to a middle school, the Plaintiff clearly stated in her response: "I do not want a transfer." [Anderson Dep. Ex. 32, Doc. 19–7 at 29]. Finally, when the Plaintiff heard a rumor in November 2006 that CMS was considering transferring her because of her medical condition, the Plaintiff's lawyer wrote a letter to the Defendant threatening to seek an injunction if a transfer was attempted. [Largess Letter, Doc. 19–10 at 3]. in light of this forecast of evidence, no reasonable jury could conclude that the Defendant failed to offer the Plaintiff the accommodation of a transfer to a different school. The Plaintiff's failure to accept this reasonable accommodation when it was offered is fatal to her ADA claim. *See Schmidt v. Methodist Hosp. of Ind., Inc.,* 89 F.3d 342, 344–45 (7th Cir.1996) (finding plaintiff's failure to accept reasonable accommodation "renders [him] unqualified under the ADA").

■ Lastly, the Plaintiff alleges in her Complaint that the Defendant also discriminated against her by "ridiculing [her] as 'obsessed' with her medical condition and having emotional problems for asking for accommodations...." [Complaint, Doc. 8–1 at ¶ 84]. In order to establish a discrimination claim under the ADA, a plaintiff must demonstrate that she suffered an adverse employment action because of her disability. *See EEOC v. Stowe–Pharr Mills, Inc.,* 216 F.3d 373, 377 (4th Cir.

2000). An adverse employment action is a discriminatory act that adversely affects the "terms, conditions, or benefits" of employment. *Munday v. Waste Mgmt. of N. Am., Inc.,* 126 F.3d 239, 243 (4th Cir.1997). The existence of an adverse employment action is "an absolute precondition" to a discrimination claim. *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985).

█ The Plaintiff has failed to identify any term, condition or benefit of employment that was adversely affected by these allegedly discriminatory acts. The fact that the Plaintiff may have been ridiculed for her complaints about her workload is insufficient to show an adverse employment action. *See Cooper v. So. Cal. Edison Co.,* 170 Fed.Appx. 496, 498 (9th Cir. 2006) (finding ridicule and ostracism suffered by plaintiff did not constitute an adverse employment action). Without a sufficient forecast of evidence to show that she suffered an adverse employment action because of her disability, this discrimination claim also must be dismissed.

### ORDER

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 19] is **GRANTED,** the Plaintiff's Motion for Partial Summary Judgment [Doc. 21] is **DENIED,** and this case is hereby **DISMISSED.** A Judgment consistent with this Memorandum of Decision and Order shall be entered simultaneously herewith.

**IT IS SO ORDERED.**