**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 10-1539**

———————————

PAULA CRABILL,

Plaintiff - Appellant,

v.

CHARLOTTE MECKLENBURG BOARD OF EDUCATION,

Defendant - Appellee.

———————————

**No. 10-1553**

———————————

PAULA CRABILL,

Plaintiff - Appellee,

v.

CHARLOTTE MECKLENBURG BOARD OF EDUCATION,

Defendant - Appellant.

———————————

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Martin K. Reidinger, District Judge. (3:08-cv-00598-MR-DSC)

———————————

Argued: March 23, 2011                Decided: April 20, 2011

———————————

Before NIEMEYER and DAVIS, Circuit Judges, and HAMILTON, Senior Circuit Judge.

———————————

No. 10-1539 affirmed in part, vacated in part, and remanded; No. 10-1553 affirmed by unpublished opinion. Judge Davis wrote the majority opinion, in which Senior Judge Hamilton joined. Judge Niemeyer wrote a dissenting opinion.

---

**ARGUED**: S. Luke Largess, TIN, FULTON, WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellant/Cross-Appellee. Mason Gardner Alexander, Jr., FISHER & PHILLIPS, LLP, Charlotte, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF**: Margaret M. Kingston, FISHER & PHILLIPS, LLP, Charlotte, North Carolina, for Appellee/Cross-Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Circuit Judge:

Appellant/Cross-Appellee Paula Crabill, a former high school guidance counselor for Appellee/Cross-Appellant Charlotte Mecklenburg Board of Education ("School Board"), filed this action asserting that the School Board failed to offer her reasonable accommodations for her disability, resulting in her premature retirement from employment, and thereby violated the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, et seq. After the parties filed cross-motions for summary judgment, the district court applied the doctrine of equitable tolling to deem Crabill's lawsuit timely-filed even though Crabill filed suit beyond the 90-day period provided by the ADA. The district court concluded on the merits, however, that Crabill could not persuade a reasonable jury to find in her favor on all the elements of her ADA claims and therefore granted summary judgment to the School Board. We hold, for the reasons set forth within, that the district court properly applied the doctrine of equitable tolling but erred in granting summary judgment to the School Board for Crabill's post-April 2007 ADA claim. Accordingly, we affirm in part and vacate in part the district court's judgment, and remand the case for further proceedings.

## I.

We review the grant of summary judgment de novo. Waller v. City of Danville, 556 F.3d 171, 174 (4th Cir. 2009). Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, "no material facts are disputed and the moving party is entitled to judgment as a matter of law." Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

## A.

In September 1998 Crabill commenced work as a guidance counselor at Myers Park High School. Her job duties included, but were not limited to, assisting students with their course selections and typing recommendation letters for college applicants. Generally, the school divided the students alphabetically in order to distribute students to specific counselors but certain students, such as the International Baccalaureate ("IB") students, or students for whom English was a second language, were assigned to a counselor without regard to the alphabet. Myers Park had one of the largest student populations in the Charlotte-Mecklenburg area. Consequently, the school had the highest average number of students assigned to any one counselor.

4

In July 2002, Dr. William Anderson became the principal at Myers Park. When Anderson started, there were only three counselors at the high school, including Crabill, for a student population of more than 2500. During Anderson's first year as principal, Crabill served as the interim department chair of the school's guidance department.

Due to the additional duties assigned to her as department chair and then-undiagnosed medical problems, Crabill requested of Anderson that he reduce her caseload. Anderson declined to institute any changes in the manner in which students were assigned to counselors. Anderson did, however, hire an additional three counselors, bringing the total number to six. In April 2003 Crabill asked to be relieved of department chair duties the following school year.

In May 2003 Crabill was diagnosed with Chari Malformation ("Chari I"). Chari I is a malformation of the brain stem that impedes the flow of cerebral-spinal fluid. Crabill's symptoms included weakness, tingling and numbness in her arms and legs, sensations of electric shock and burning, dizziness, memory problems, and vertigo. In particular, when Crabill typed, her arms would become weak and her vertigo increased.

After Crabill was diagnosed with Chari I, she met with Anderson to again request an adjustment in her caseload for the following school year. Crabill also requested that she not be

5

required to carry heavy items and be excused from activities that would require her to drive at night. Anderson agreed to provide Crabill with accommodations to address her difficulties with driving and carrying heavy items but did not agree to reduce Crabill's case load. The day after meeting with Crabill, and with Crabill's support, Anderson named two other counselors as the guidance department co-chairs. Anderson reduced their caseloads because of their new responsibilities.

In July 2003, Crabill wrote Anderson an e-mail explaining that she needed a reduced caseload "because the work demands exasperated [sic] [her] condition." J.A. 222. Crabill told Anderson that it was "medically necessary" for her caseload to be reduced. Id. Anderson responded the next day that he would not make any decisions until he had the chance to discuss the request with the new department co-chairs. The following day, Anderson "yelled" at Crabill for asking about her caseload. J.A. 604. He wrote a follow-up e-mail:

> I was very frustrated with you today and continue to be frustrated by your continued obsession/perseverance over [the department co-chair's] caseload and the fairness of her numbers. It seems that is [sic] it is very difficult for you to move past last year and accept the fact that [the co-chairs] and I made the decisions regarding the caseload for the guidance department.
>
> Paula, you must be a team player and accept the fact that [the co-chairs] will be the department chairs this year. I cannot have you second guessing their

6

> decisions, the intent of their decisions, and revisiting issues that are in the past tense . . . .
>
> I hope that in the future you will spend your precious time and energy serving our students, parents and staff members more efficiently and effectively.

J.A. 224.

The following month, Crabill obtained a note from her treating neurologist stating that her caseload needed to be kept between 250 and 300 students. This range reflected the school district's average workload for high school counselors. However, at Myers Park, the average caseload was 422 students per counselor. Anderson declined to reduce Crabill's caseload, citing the increase to other counselors' caseloads it would cause. As a result, Crabill had approximately 310 students for the 2003-2004 school year.

In July 2004, the department chair told Crabill that she would have 460 students for the 2004-2005 school year. Crabill wrote to Anderson and the assistant principal that she did not believe she could manage 460 students, especially with her problems with typing due to her Chari I diagnosis. As a substitute, Crabill proposed that she take the IB students, which would reduce the number of letters she would need to type. Anderson responded that he found "frustrating" all the "conflict and angst" she was causing and how "[s]mall tasks and requests become mountains." J.A. 131. Anderson also stated that Crabill

needed to work in the "best interest of our students and school instead of comparisons as to who works the hardest or has the heaviest load." J.A. 131. After receiving Anderson's e-mail, Crabill helped make the caseload divisions among the counselors.

In spring 2005, Crabill applied for counseling openings at two middle schools and asked the School Board's human resources department to assist her. Crabill told Anderson that she was seeking a transfer and asked Anderson not to disclose her medical diagnosis. Crabill did not receive either position.

During the summer of 2005, Lyn Shropshire became the counseling department chair at Myers Park. Crabill spoke with Shropshire about Anderson and her medical problems. For the 2005-2006 school year, Crabill was responsible for the additional duties of "Future Center" and "Summer Ventures." These additional responsibilities were considered less time-consuming than those of other counselors. Consequently, Crabill was assigned even more students, the highest of all of the counselors. After Crabill questioned her caseload, she was called into a meeting with Anderson, the vice-principal and Shropshire and admonished for questioning the work distribution.

In November 2005, Crabill again sent Anderson a medical note from her doctor requesting between 250-300 students. Anderson responded by asking Crabill if she wanted him to begin searching for a transfer to a middle school for her. Crabill

8

told Anderson that she did not want to transfer. Anderson also sent Crabill the so-called "matrix" that was used to assign students and other tasks to counselors. In addition, Shropshire sent Crabill an e-mail on November 16, 2005 admonishing Crabill for questioning her caseload.

Shortly thereafter, Principal Anderson was promoted to a position outside of Myers Park. Before he left the school, Anderson e-mailed his replacement, Tom Spivey, about Crabill because he wanted to give Spivey a "heads up on this counselor problem." J.A. 255. Anderson warned Spivey that "[Crabill] will probably come to you asking for consideration to reduce her caseload (329) because of her so called 'medical' problems," and "strongly recommend[ed]" that Spivey "not reduce her caseload." J.A. 255. Anderson also forwarded Crabill's earlier question about her doctor's note and stated,

> I just wanted you [to] have a greater understanding of how Paula Crabill operates. She has very selective memory and will try to make you believe that she doesn't really care about caseloads, but her recollection of certain issues is very Disneyland like, Lin [sic] is a good dept. chair and she, like me, is fed up with paula's [sic] whining and end runs.

J.A. 250.

Several hours later, Anderson wrote to Crabill, with a copy to Spivey:

> You seem obsessed with someone else having a bigger caseload than you. If you feel the high caseload is too extreme for you, I would suggest that you

9

> seriously consider a transfer to a middle school or elementary school for 2006-07. There is too much energy and precious work time being wasted by you and other counselors addressing this issue.

J.A. 253.

Crabill approached Spivey in March 2006. She explained to Spivey her condition and her prior requests for a reduced caseload. Crabill requested he consider her request for the following school year. Two weeks later, Crabill received an envelope through the school system's courier system with no return address or cover letter, containing a brochure about a seminar on managing emotional problems. Crabill was upset by the brochure and believed Anderson had sent it. Anderson denied having anything to do with the brochure.

On July 26, 2006, Crabill wrote Spivey requesting three specific accommodations: (1) a flexible work schedule; (2) a cap on her caseload as close to 300 students as possible; and (3) voice recognition software for typing. Crabill was aware that Spivey would be on vacation the week he received the letter. Shortly thereafter, Crabill was assigned 20 more students than the department average.

On August 9, 2006, Crabill sent Spivey an e-mail and delivered another copy of the letter. In mid-September 2006, Shropshire requested a meeting with Crabill, the vice principal, Spivey and another counselor to discuss "departmental concerns."

J.A. 283. In addition, Spivey attended a guidance department meeting on September 20, 2006 and took notes that showed some members of the department were upset at the way the administration was treating Crabill.

On October 9, 2006, Spivey wrote to human resources that he had a counselor with documented health-related issues, including a doctor's note that she would benefit from a workload reduction. He asked that human resources review the matter and provide feedback. Spivey also told human resources that he thought Crabill should be transferred to a middle or elementary school.

Shortly thereafter, Crabill slipped and fell at school, causing her to miss work for several weeks. After learning of rumors that Crabill was going to be transferred, Crabill's counsel wrote a letter to human resources, warning the School Board that a forced job relocation due to a workplace injury violated North Carolina's workers' compensation laws.

The parties dispute the extent to which Crabill and Spivey spoke to discuss the possibility of her moving to a middle school position as an accommodation to address her medical concerns. The School Board contends that Spivey and Crabill had several informal conversations about Crabill moving to a middle school position. Appellee Br. at 13. Crabill asserts, to the contrary, that she never had a conversation with Spivey about

11

moving to a middle school as an accommodation. Appellant Br. at 21.

In November 2006, two human resources employees, Kathy Augar and Regina George, began inquiring into accommodations for Crabill. George asked Spivey if the alphabetic distribution of caseloads could be rotated so that no one counselor had the largest caseload every year. Spivey responded that it could work, but that the school preferred keeping counselors with the same students for multiple years.

On April 12, 2007, Regina George met with Crabill and Crabill told George she was willing to transfer, and in particular to a middle school, where the typing task of counselors was considerably lighter. George learned of several vacancies for the following school year including two middle schools, five or six high schools, and a new high school that did not yet have a senior class. Nevertheless, George told Crabill only about the opening at the new high school. Crabill went to interview for the position but learned upon arriving that the position had already been filled.

In a follow up meeting with Crabill, George requested additional medical documentation, which Crabill obtained. Crabill did not meet with George again until June 11, 2007. The two discussed several accommodations: (1) a flexible work schedule; (2) regular work breaks; (3) a cap on student

12

caseload; (4) a strict limit on additional duties assigned; and (5) voice recognition software. The School Board did not respond to any of Crabill's proposals for a redistribution of the caseload.

For the 2007-08 school year, Crabill received 379 students in her caseload, the average number of students as other counselors. Feeling overwhelmed by her job duties, Crabill retired on disability in January 2008.

## B.

Crabill filed her charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on February 20, 2007. On February 26, 2007, the EEOC mailed the charge to the School Board. More than a year later, on April 3, 2008, an EEOC investigator met with Crabill's counsel.

On April 22, 2008, the EEOC mailed Crabill a right-to-sue notice. As discussed below, the district court found that neither Crabill nor her counsel ever received the notice. On August 19, 2008, Crabill's counsel wrote a letter to the EEOC referring to the prior meeting and asking to meet with the EEOC legal staff about the case. The EEOC responded by calling Crabill's counsel to inform him that the EEOC had dismissed the charge and issued the right-to-sue letter on April 22, 2008. This conversation was the first time Crabill's counsel learned the letter had been mailed in April. After requesting the EEOC

resend a copy of the letter, Crabill received the EEOC dismissal and notice of her right-to-sue in September 2008. The EEOC authenticated its file of Crabill's charge and it does not contain records indicating the right-to-sue letter sent to Crabill was returned, unable to be delivered or otherwise not received by Crabill. This action was filed on November 12, 2008.

## II.

### A.

We first address the School Board's appeal from the district court's application of equitable tolling. The School Board contends that Crabill's suit was untimely and that the district court erred in applying equitable tolling to excuse Crabill's delay in filing suit. In the non-habeas context, we review the district court's decision to utilize equitable tolling for an abuse of discretion. Rouse v. Lee, 339 F.3d 238, 247 n.6 (4th Cir. 2003) (en banc); see also Chao v. Va. Dept. of Transp., 291 F.3d 276, 279-80 (4th Cir. 2002) ("We review the district court's ruling on equitable tolling for abuse of discretion."). While the School Board urges us to review the district court's decision de novo, utilizing an abuse of discretion standard of review is in accord with our sister circuits. See Mr. I. v. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 23 (1st Cir. 2007) (reviewing for abuse of discretion the

14

district court's decision whether to apply equitable tolling); Alli-Balogun v. U.S., 281 F.3d 362, 367-68 (2d Cir. 2002) (same); Teemac v. Henderson, 298 F.3d 452, 456 (5th Cir. 2002) (same); Leong v. Potter, 347 F.3d 1117, 1121 (9th Cir. 2003) (same); Harms v. I.R.S., 321 F.3d 1001, 1006 (10th Cir. 2003) (same). But see Seay v. Tenn. Valley Auth., 339 F.3d 454, 469 (6th Cir. 2003) ("We review a district court's decision to grant or deny equitable tolling de novo when the facts are undisputed or the district court rules, as a matter of law, that equitable tolling is not available; in all other circumstances we review for an abuse of discretion.").

B.

After a complainant files a charge with the EEOC, the ADA requires the EEOC to "notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent." 42 U.S.C. § 2000e-5(f)(1). The 90-day filing requirement is "not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Laber v. Harvey, 438 F.3d 404, 429 n.25 (4th Cir. 2006) (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)). Here, the right-to-sue notice was mailed to Crabill on April 22, 2008, and the law presumes its receipt on April 25, 2008. Baldwin County Welcome Ctr. v. Brown,

15

466 U.S. 147, 148 n.1 (1984) (for constructive receipt purposes, courts presume a mailing reaches the intended recipient within three days). Thus, the 90-day period ended on July 24, 2008, and Crabill's complaint was therefore untimely filed. Having determined that Crabill's filing was untimely, the district court concluded that equitable tolling of the filing period was appropriate.

Equitable tolling applies in two general kinds of situations. In the first, the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990); Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000). In the second, "extraordinary circumstances beyond the plaintiffs' control made it impossible to file the claims on time." Harris, 209 F.3d at 330 (quoting Alvarez-Machain v. United States, 107 F.3d 696, 700 (9th Cir. 1996)).

Equitable tolling is a discretionary doctrine that "turns on the facts and circumstances of a particular case." Harris, 209 F.3d at 330 (quoting Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999)). Federal courts have typically extended equitable relief only sparingly. Irwin, 498 U.S. at 96; see also Harris, 209 F.3d at 330. Consequently, "any resort to equity must be reserved for those rare instances where—due to circumstances external to the party's own conduct—it would be

16

unconscionable to enforce the limitation period against the party and gross injustice would result." Harris, 209 F.3d at 330.

Here, the district court concluded that reasonable grounds existed such that equitable tolling of the filing period is appropriate. Crabill v. Charlotte-Mecklenburg Bd. of Educ., 708 F. Supp. 2d 542, 554-55 (W.D.N.C. 2010). In particular, the court relied on Crabill's sworn statement that she was home the entire week of April 21, 2008, and checked the mail every day of that week; that she routinely checks her mailbox everyday; and that she always asked the post office to hold her mail when she went out of town. Id. On this showing, the district court concluded that Crabill's testimony established that she was "extremely diligent in checking her mail for any correspondence from the EEOC." Id. at 554. In addition, the court concluded that Crabill was diligent in maintaining contact with her counsel regarding the status of her case. Consequently, the district court concluded that Crabill "presented sufficient evidence of circumstances 'beyond [her] control or external to [her] own conduct . . . that prevented [her] from filing on time." Id. at 555 (quoting United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004)).

On this record, we cannot say that the district court abused its discretion in holding Crabill successfully rebutted

17

the presumption of actual receipt of the right-to-sue notice. The court found that Crabill was diligent in watching her mail and staying in contact with her counsel regarding her case; we have no warrant in deeming these findings clearly erroneous. We are persuaded that Crabill's failure to receive the letter was the result of circumstances external to her own conduct. In affirming the application of equitable tolling, we agree with the Seventh Circuit that a "plaintiff should not lose the right to sue because of fortuitous circumstances or events beyond [her] control which delay receipt of the EEOC's notice." DeTata v. Rollprint Packaging Products, 632 F.3d 962, 969 (7th Cir. 2011) (quotation omitted).[1]

## III.

Having concluded the district court did not err in applying equitable tolling to excuse Crabill's untimely filing of this action, we examine the propriety of the district court's rejection of Crabill's reasonable accommodation claim as a matter of law.

---

[1] In so concluding, we echo the sentiment of our sister circuit and "note that if the EEOC had followed its former practice of sending right-to-sue letters by certified mail, this dispute would, in all likelihood, have never arisen." Duron v. Albertson's LLC, 560 F.3d 288, 291 (5th Cir. 2009).

18

The ADA prohibits discrimination against a "qualified individual with a disability" with respect to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a).

One form of discrimination prohibited by the ADA is a failure to make a reasonable accommodation. See 42 U.S.C.A. § 12112(b)(5). In a failure-to-accommodate case, an employee establishes a prima facie case by showing "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." Rhoads v. F.D.I.C., 257 F.3d 373, 387 n.11 (4th Cir. 2001). The ADA provides a definition of the term "reason accommodation":

The term "reasonable accommodation" may include-

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and

19

other similar accommodations for individuals with disabilities.

42 U.S.C.A. § 12111(9).

Once an employer's responsibility to provide a reasonable accommodation is triggered, it may be necessary for the employer to engage in an "interactive process" to determine the appropriate accommodation under the circumstances. 29 C.F.R. § 1630.2(o)(3). See also Taylor v. Phoenixville School Dist., 184 F.3d 296, 311-12 (3d Cir. 1999) (finding that "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith"); Haneke v. Mid-Atlantic Capital Mgmt., 131 Fed. Appx. 399, *1 (4th Cir. 2005) (unpublished) (finding that "[i]mplicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation"); Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996) (explaining that "the employee's initial request for an accommodation . . . triggers the employer's obligation to participate in the interactive process of determining one"); Jakubowski v. Christ Hosp., 627 F.3d 195, 202 (6th Cir. 2010).

As the Seventh Circuit has noted:

No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable

20

efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135-36 (7th Cir. 1996).

To be sure, and contrary to Crabill's contentions, an employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process. See Rehling v. City of Chicago, 207 F.3d 1009, 1016 (7th Cir. 2000). Rather, the employee must demonstrate that the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee. See id. In addition, "[a]n employer is not obligated to provide an employee the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation." Crawford v. Union Carbide Corp., 202 F.3d 257 (4th Cir. 1999) (unpublished) (quoting Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 633 (7th Cir. 1998)).

Here, the district court correctly concluded that the ADA does not require an employer to reallocate essential job functions or assign an employee "permanent light duty". Crabill,

21

708 F. Supp. 2d at 556 (quoting Carter v. Tisch, 822 F.2d 465, 467 (4th Cir. 1987)). In particular, reducing Crabill's caseload would have shifted her duties to other counselors in the department, thereby increasing their workload. As the district court noted, "an accommodation that would require other employees to work harder is unreasonable." Crabill, 708 F. Supp. 2d at 556 (quoting Mason v. Avaya Communications, Inc., 357 F.3d 1114, 1121 n.3 (10th Cir. 2004)). See also Rehrs v. Iams Co., 486 F.3d 353, 357 (8th Cir. 2007); 29 C.F.R. § 1630.2(p)(2)(v) (impact to other employees on their ability to perform their duties is a relevant factor in determining the reasonableness of an accommodation).

More persuasively, Crabill also argues that the School Board could have accommodated her disability by transferring her to another school, especially a middle school, where she could have had a reduced caseload with different responsibilities. Acknowledging the validity of this assertion, the district court concluded, in rejecting the claim, that no reasonable jury could conclude that the School Board failed to offer Crabill the accommodation of a transfer to a different school. Crabill, 708 F. Supp. 2d at 557. The court reasoned that Crabill's refusal of

22

a medical transfer in 2005 supported its conclusion.[2] While the district court was surely correct in its legal assessment as to the period before the spring of 2007, we disagree with its conclusion that Crabill failed to generate a genuine dispute of material fact as to the availability of a reasonable accommodation by transfer for the period starting with the 2007-2008 school year.

On April 12, 2007, Crabill told Regina George that she would accept a transfer as a reasonable accommodation, including transferring to a middle school. After meeting with Crabill, George sought assistance in reassigning Crabill "to a middle school in an effort to meet her medical accommodation request." J.A. 309-10. George learned of vacancies at two middle schools and five or six high schools, including a new school that did not yet have a senior class. Despite learning of vacancies at two middle schools, George only told Crabill about one of the

---

[2] In addition, the court reasoned that when Crabill's counsel wrote to the School Board in November 2006 warning she would seek an injunction if a transfer was attempted, Crabill was expressly rejecting a transfer as a reasonable accommodation. The School Board's contention that the November 2006 letter "blocked" any effort to accommodate Crabill with a transfer to another school is certainly a plausible view of the record, but it does not foreclose Crabill's claim as a matter of law. Crabill contends, equally plausibly, that the letter was written in regards to Crabill's rights under the state workers' compensation law, not the ADA. We agree with Crabill that this dispute is genuine and material and is proper grist for a jury.

23

high school vacancies. For these reasons, we are persuaded that a reasonable jury could conclude that the School Board failed to offer Crabill the accommodation of a transfer to a different school after her April 12, 2007 request.

Finally, Crabill asserted a separate count in her complaint to contend that the School Board intentionally discriminated against her in violation of the ADA, namely, that she was constructively discharged from her position by virtue of her forced disability retirement in the absence of a reasonable accommodation. We have held that a "complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge." Johnson v. Shalala, 991 F.2d 126, 132 (4th Cir. 1993).

We are persuaded that Crabill has generated a genuine dispute of material fact as to whether her alleged premature retirement is causally related to the School Board's failure to provide a reasonable accommodation – a transfer. Contrary to the district court's legal conclusion, a reasonable jury could conclude that the School Board's culpable failure to accommodate Crabill's transfer amounted to an adverse employment action proximately prompting her early retirement. As with all elements of her claim, Crabill bears the risk of non-persuasion as to

24

proof of any damages flowing from her allegedly premature retirement from employment.

## IV.

In conclusion, we hold that: (1) the district court did not abuse its discretion in applying equitable tolling to allow Crabill's belated filing of her ADA claim; (2) the district court erred in granting the School Board's motion for summary judgment in regard to Crabill's post-April 12, 2007 reasonable accommodation claim; and (3) the district court erred insofar as it precluded Crabill from seeking to show that her alleged premature retirement was a proximate consequence of the School Board's failure to offer a reasonable accommodation in the form of a transfer to another school for school year 2007-2008. Accordingly, we affirm in part and vacate in part the district court's judgment and we remand the case for further proceedings consistent with this opinion.

No. 10-1539 <u>AFFIRMED IN PART,
VACATED IN PART, AND REMANDED</u>
No. 10-1553 <u>AFFIRMED</u>

25

NIEMEYER, Circuit Judge, dissenting:

The record in this case shows that Crabill's action was untimely filed. The EEOC issued a right-to-sue letter on April 22, 2008, and mailed it to Crabill at her given address. The evidence also shows that the EEOC did not receive any return of the mail or any indication that the U.S. Postal Service was unable to deliver it. Crabill did not file suit until November 12, 2008, more than 90 days after the EEOC sent its right-to-sue letter. To justify her untimely filing of suit, Crabill states that she did not receive the right-to-sue letter, although she checked her mail regularly. In this circumstance, I would find it an abuse of discretion to conclude that the simple denial of receipt of a letter tolls the statute of limitations. This conclusion, I am afraid, too readily undermines the requirements established by Congress in 42 U.S.C. § 2000e-5(f)(1), where it fixed the limitations period at 90 days.

On the merits, I would find summary judgment appropriate because Crabill did not establish a prima facie case that the School Board failed to provide her with a reasonable accommodation for her disability. The Americans with Disabilities Act requires employers to make reasonable accommodations for employees with disabilities, 42 U.S.C. § 12112(b)(5)(A), and reassignment to a vacant position may be a reasonable accommodation, 29 C.F.R. § 1630.2(o)(2)(ii). Because

26

the employee has the burden of proving that an accommodation is reasonable, U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002), I would hold, in line with the Second and Third Circuits, that an employee has the burden of showing that a vacancy existed at the time a transfer was needed. See Jackan v. New York State Dept. of Labor, 205 F.3d 562, 567 (2d Cir. 2000); Shapiro v. Township of Lakewood, 292 F.3d 356 (3d Cir. 2002). Here, the only evidence Crabill presented tended to show that vacancies may have existed at a previous time, but did not show that those vacancies existed at the time she wanted to transfer. Therefore, I would affirm the judgment of the district court.